UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
                         FORT MYERS DIVISION


MARSHALL WATSON, III,

            Plaintiff,

vs.                                Case No.   2:06-cv-17-FtM-29DNF

TIFFANY LANE,

            Defendant.
_____


                           **OPINION AND ORDER**

      This matter comes before the Court upon Defendant Lane's Renewed

Motion for Summary Judgment (Doc. #87, Motion) filed July 17, 2008.[1]

Defendant attaches to her Motion, the Affidavit of Tiffany Lane (Doc.

#87-2, "Exhibit A") and a document entitled "Dangerous Assessment"

dated February 4, 2004, which is signed by Lynn McNamara, MA/LMHC,

Assessment Team, Florida Civil Commitment Center and concerns Resident

Marshall Watson (Doc. #57-2, "Exhibit B").  The Court, in its Order

dated July 31, 2008, advised Plaintiff how to respond to a motion for

---

   [1]The Court, in its Order dated March 26, 2008, previously
denied Defendant Lane's Motion for Summary (Doc. #83) pursuant to
Fed. R. Civ. P. 56 (f). In particular, Plaintiff contended that he
had not received relevant discovery materials, including certain
materials from Delgado's clinical files.  The Court found that the
material from Delgado's files may permit Plaintiff an opportunity
to rebut the absence of a genuine issue of material fact. On April
3, 2008, Defendant Lane provided the Court with notice that the
requested materials had been provided to Plaintiff. See Defendant
Lane's Notice to Court (Doc. #84).  Plaintiff has not filed
objections to the Notice, nor sought a motion to compel the
production of any discovery.

summary judgement (Doc. #88). Plaintiff filed a Response to the Motion (Doc. #89, Response) on August 25, 2008. This matter is now ripe for review.

**I.**

Plaintiff filed a *pro se* civil rights complaint alleging that Defendants Harry, Corcoran, and Lane violated Plaintiff's Fourteenth Amendment rights by failing to protect Plaintiff from an attack by another FCCC resident, Jorge Delgado (Delgado). See generally Complaint (Doc. #1, Complaint). As relief, Plaintiff seeks $200,000,000 in compensatory and punitive damages. Complaint at 7. The Court previously granted Defendants Corcoran and Harry's Motion for Judgment on Pleadings. See September 28, 2007, Order (Doc. #73). Consequently, Plaintiff's Fourteenth Amendment claim for failure to protect remains pending only against Defendant Lane.

Uncontroverted Facts

The following are the relevant uncontroverted facts as gleaned from the record before the Court. At all times in the Complaint, both Plaintiff and resident Delgado were involuntarily civilly committed as a sexually violent predators pursuant to Fla. Statute §394.910 et seq., and were confined at the Florida Civil Commitment Center (FCCC). Defendant Lane was the Security Director at the FCCC at the time of the incident.

Sometime in May 2004, Plaintiff voluntarily requested to be moved from "D" dormitory to "F" dormitory. Complaint at 3, ¶6. Several

-2-

days after his reassignment to "F" dormitory, FCCC residents Delgado, Garcia, and one other unidentified Spanish resident, came into Plaintiff's room in "F" dormitory and attacked him. Id. at ¶7. Upon leaving the dormitory, Delgado was stopped and searched by an FCCC staff member, who found a "shank" on Delgado. Id. Plaintiff, along with Delgado and Garcia, were all placed on "cell restriction" after the May 2004 incident. Id. at 4, ¶7.

Upon his release from cell restriction, Plaintiff was transferred out of "F" dormitory and reassigned back to "D" dormitory. Id. at 4, ¶8. The next day, after his transfer back to "D" dormitory, Plaintiff "was confronted" by another Spanish resident and "a physical confrontation resulted." Id. Both Plaintiff and the other resident were placed on cell restriction. Id. After this second release from cell restriction, Plaintiff was reassigned from "D" dormitory back to "F" dormitory, where both Delgado and Garcia were housed. Id. at ¶9.

On June 27, 2004, Plaintiff was stabbed repeatedly by resident Delgado with a home-made shank in and near Delgado's room in "F" dormitory. Plaintiff received numerous stab wounds from the attack necessitating medical treatment. The investigative report[2] of the stabbing incident reflects that Plaintiff voluntarily left his room, which was located in Quad 1 of "F" dormitory, and walked to the second tier in Quad 3, because a resident known as "Chief" wanted to see

---

[2]The October 12, 2004 Investigation of Stabbing of Resident Marshall Watson SVP# 990200 is attached to Plaintiff's Motion of Supplemental Facts (Doc. #32-2, Investigative Report).

-3-

Plaintiff. According to Plaintiff, he was walking past resident Delgado's room, when Delgado emerged from his room and began stabbing him.

It does not appear that there were any eyewitnesses to the stabbing. Thus, it is unclear what events led up to the incident. According to the Investigative Report:

> Resident Watson stated that the Mexicans have been coming after him for several weeks and he has always been able to kick their butt. Resident Watson stated that in the first part of June Resident Delgado, Resident Garcia, and Resident Amador came into his room and attacked him. Resident Watson stated that he was able to defend himself and chased all three out of his room. Resident Watson stated later that day FSM Mosley caught Resident Delgado with a knife. Resident Watson stated that about 2 weeks later Resident Amador in the chow hall for no reason again attacked him. Resident Watson stated again he was able to defend himself.

Investigative Report at 10. Delgado denies that he was the aggressor. Resident Delgado "stated that Resident Watson came to his room and stated he was going to have sex with Resident Delgado. Delgado wrote that resident Watson placed the knife to his neck." Id. at 13. Nevertheless, for purposes of this Motion, the Court will presume that Plaintiff was not the aggressor but was an innocent victim in the stabbing.

<u>Controverted Facts</u>

According to the Complaint, Defendant Lane was "responsible for making the decision to have Plaintiff moved back to F-dorm" despite being aware of "the whole situation," including "that resident Delgado had been found to have a homemade shank on his person and in his cell shortly before Plaintiff was relocated back to F-dorm." Complaint at

-4-

¶9. Plaintiff submits that "Defendant Lane had Plaintiff thrown back into a potentially life-threatening situation." Id.

Defendant Lane, in her Motion, asserts that "the record evidence shows that Defendant Lane had no actual knowledge of specific facts from which an inference could be made that there existed a substantial risk of serious harm to Plaintiff." Motion at 1, ¶2-a. In the alternative, Defendant Lane asserts that her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 2, ¶2-b.

**II.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue at to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. Id. The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of

persuasion" and must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." Beard v. Banks, 548 U.S. 521, 529 (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences" must be drawn in favor of the non-moving party. Beard, 548 U.S. at 529-530 (citations omitted); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). The court, however, "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [the court's] inferences must accord deference to the views of prison authorities." Beard at 530. "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor, are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling in a motion for summary judgment." Scott v. Harris 550 U.S. 372, 127 S. Ct. 1769, 1776

(2007). In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002).

**III.**

The Court recognizes that the FCCC is not a prison and Plaintiff is not a prisoner. Troville v. Venz, 303 F.3d 1256, 1260 (11th Cir. 2002). Nonetheless, the Court takes judicial notice that the State of Florida enacted the Jimmy Ryce Act, by which a person who is determined to be a sexually violent predator[3] is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2). Further, the Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." Westerheide v. State, 831 So.2d 93, 112 (Fla. 2002); see also Kansas v. Hendricks, 521 U.S. 346 (1997) (holding that the Kansas Sexually Violent Predator Act did not establish criminal proceedings, and involuntary

---

[3]A "sexually violent predator" is defined by the Act as any person who:

(a) has been convicted of a sexually violent offense; and
(b) suffers from a mental abnormality or personality disorder that makes the person more likely to engage in acts of sexual violence if not confined in a secure facility for log-term control, care, and treatment.

Fla. Stat. § 394.912(10) (2002).

confinement pursuant to the Act was not punitive).[4] The Florida legislature, in its statement of "findings and intent," explained that the Act was aimed at "a small but extremely dangerous number of sexually violent predators . . . who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the Baker Act (§§ 394.451-394.4789, Fla. Stat.)." Fla. Stat. § 94.910 (2000). Thus, residents at the FCCC are considered "totally confined," and subject to certain internal regulations much like those established by the Florida Department of Corrections. See Fla. Stat. § 394.912(11).

Thus, a person who is civilly committed is in a position analogous to a criminally confined prisoner. See Pullen v. State, 802 So. 2d 1113, 1119 (Fla. 2001)(in that "the curtailment of the fundamental right of liberty is implicated in both criminal proceedings and involuntary civil commitments"). Nevertheless, an individual who has been involuntarily civilly committed has "liberty interests under the due process clause of the Fourteenth Amendment to safety, freedom from bodily restraint, and minimally adequate or reasonable training" as required to ensure safety and freedom from restraint. Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. 1996)(citing Youngberg v. Romeo, 457 U.S. 307, 322 (1982)). See also Lavender v. Kearney, 206 Fed. Appx. 860, 862 (11th Cir 2006). While

---

[4] "Florida's Ryce Act is similar to the Kansas Sexually Violent Predator Act in many respects. See Kan. Stat. Ann. § 59-29a01-a20 (Supp. 2001)." Westerheide, 831 So.2d at 99 n.6.

residents at the FCCC are subject to internal regulations, the Court recognizes that they are afforded a higher standard of care than those who are criminally committed.  See id.  Indeed, the Eleventh Circuit Court of Appeals has held that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  Id.

Although analyzed under due process standard, the Court examines cases addressing failure to protect claims under the Eight Amendment for guidance.[5]  A prison official's duty to protect inmates from violent attacks by other inmates stems from the Eighth Amendment's proscription against cruel and unusual punishment. Farmer v. Brennan, 511 U.S. 825, 833 (1994).  However, not every injury "suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834.  To establish a failure-to-protect claim, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the governmental official acted with "deliberate indifference" to the inmate's health or safety. Id. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety" - that is,

---

[5]Plaintiff's rights arise from the Fourteenth Amendment, though the case law developed with regard to the Eighth Amendment prohibitions against cruel and unusual punishment is analogous. Cook ex. rel Estate of Tessier v Sheriff of Monroe County Fla., 402 F.3d 1092, 1115 (11th Cir. 2005). See also Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).

"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A plaintiff alleging an Eighth Amendment violation need not show that officials believed that harm would actually occur "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842. Whether an official had "actual knowledge of a substantial risk" is a "question of fact, subject to demonstration in the ususal way, including inference from circumstantial evidence." Id. Evidence of past attacks which were "long-standing, pervasive, well-documented, or expressly noted by prison officials in the past" and where the circumstances suggest that the defendant was exposed to the information would be sufficient to show the defendant had actual knowledge. Id. The plaintiff is not required to show that he was the intended victim of the assailant. Id. at 843.

An official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004). Merely possessing general knowledge that a particular inmate is a problem inmate with a well-documented history of prison disobedience who is prone to violence is not sufficient. Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003). Rather, a plaintiff must demonstrate that the defendant was aware of "specific facts" from which an inference could be drawn that a substantial risk of serious harm exists and that the prison official drew that inference. Id.

**IV.**

Based upon the uncontroverted evidence submitted by Defendant Lane, the decision to house Plaintiff back into "F" dormitory was a decision that was made by a "multi-disciplinary team," and not by Defendant alone. Lane Aff. 1-2, ¶4. The multi-disciplinary team was composed of the following individuals: Defendant Lane in her capacity as Security Director, the FCCC Social Director, the FCCC Clinical Director and the FCCC Nursing Supervisor. Id. The multi-disciplinary team was the "final decision-maker" in determining "appropriate housing for FCCC residents." Id. at 2, ¶5.[6]

The fact that Defendant Lane was a member of a committee that determined the housing assignments for FCCC residents, including Plaintiff, is insufficient to create a genuine issue of material fact regarding whether Defendant Lane had actual or constructive knowledge that Delgado was a threat to Plaintiff to any other FCCC resident. Even assuming that Defendant Lane was aware of the previous altercation in May between Delgado and Plaintiff at the time she made

---

[6]Defendant states that Defendant Lane "was not the final decision-maker in the determination of appropriate housing for FCCC residents." It is unclear whether Defendant is arguing that Defendant Lane was not the final policymaker, and thus, cannot be subject to liability for decisions made by the Administrative Committee. See, e.g., Maschmeier v. Scott, 508 F. Supp. 2d 1180, (M.D. Fla. 2007), aff'd 269 Fed. Appx. 941 (11th Cir. 2008). Because Defendant does not expound upon this argument, the Court need not address whether individuals who serve on the Administrative Committee can be held liable for decisions rendered by the Committee.

-11-

the housing decision,[7] does not equate to deliberate indifference to a known danger that rises to a constitutional tort. "The known risk of injury must be a strong likelihood, rather than a mere possibility" to constitute deliberate indifference. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990)(internal quotations and citations omitted).

Plaintiff does not allege that he ever advised Defendant Lane, or any other FCCC staff member, that tensions from the May altercation with Delgado had not subsided. Plaintiff does not claim that he voiced any objection when he was reassigned back to "F" dormitory, indicating that Plaintiff, himself, did not have any reason to be in fear of Delgado. In fact, when Plaintiff requested a dormitory change in the past, officials granted his request and reassigned him to his requested dormitory. Plaintiff remained in the same dormitory with Delgado without incident for over a month, before the stabbing occurred. Plaintiff acknowledges that he freely walked from Quad 1 to Quad 3 on his own volition, necessitating that he walk past Delgado's room to visit with another resident when the attack occurred. The fact that Plaintiff had no apprehension to move freely about "F" dormitory further confirms that Plaintiff did not believe Delgado posed a serious threat to him. While Plaintiff states that Delgado was previously found with a homemade shank by another FCCC staff member, he fails to allege that Defendant Lane had any reason to

---

[7]Defendant Lane does "not concede that this prior incident occurred." Response at 10, n.2.

believe that Delgado had again secured another weapon.  Plaintiff points to another incident in which Delgado stabbed another resident, which took place after the attack on Plaintiff.  Although potentially relevant in considering an official's constructive knowledge as to future attacks by Delgado, such events <u>after</u> Plaintiff was attacked are not relevant to show Defendant Lane's knowledge at the time Plaintiff was attacked.  Plaintiff points to no evidence that would have even alerted Defendant Lane that there was a substantial risk to Plaintiff's safety.  Even if Defendant Lane had been alerted to potential problems, "allegations that the official missed or misread warning signs that the plaintiff was in danger . . . are insufficient to establish subjective knowledge of a strong likelihood of serious harm."  <u>A.P. ex rel. Bazerman v. Feaver</u>, 293 Fed. Appx. 635, 659 (11th Cir. 2008)(TJOFLAT, J. concurring).

Plaintiff, in his Response, argues that Defendant Lane could have assigned him to any of the other eight open population dormitories. Response at 4.  "Defendants arguably should have placed Plaintiff elsewhere but merely negligent failure to protect an inmate from attack does not justify liability under section 1983."  <u>Carter v. Galloway</u>, 352 F.3d at 1350 (opining that the fact that the defendants possessed an awareness of the assailant's "propensity for being a problematic inmate" is not sufficient to make defendants culpable because it "would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court.").  Moreover, albeit not a prison, the environment of

-13-

the FCCC by its very nature lends to the same problems found in institutional settings. See Purcell v. Tombs County, 400 F.3d 1313, 1323 (11th Cir. 2005)("[i]n the jail setting, a risk of harm to some degree always exists by the nature of it being a jail."). See also Farmer, 511 U.S. at 845 (paying particular note to the fact that prison officials have the "unenviable tasks of keeping dangerous men in safe custody under humane conditions.").

Consequently, Plaintiff fails to raise a genuine dispute as to whether Defendant Lane disregarded an excessive risk to Plaintiff's safety or whether Defendant responded unreasonably to a risk of harm to Plaintiff. See Farmer v. Brennan, 511 U.S. at 844 (holding that prison officials are not liable "if they responded reasonably to the risk, even if the harm ultimately was not averted"). Because Plaintiff has failed to demonstrate that Defendant Lane was aware of specific facts from which an inference could be drawn that a substantial risk of serious harm existed, the Court finds that Defendant Lane is entitled to summary judgment.[8]

---

[8]The Court analyzed Plaintiff's failure to protect claim under the 8th Amendment standard. Arguable, the less stringent standard set forth by the Supreme Court in Youngberg v. Romero, 457 U.S. 307 (1982) could apply. In Youngberg, the Supreme Court held that the "professional judgment" standard was the appropriate test for determining whether a substantive due process right has been violated in the context of those of who have been involuntary committed. Youngberg v. Romero, 457 U.S. 307, 322-323 (1982). Under that standard, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321 (internal quotations and citations omitted).
(continued...)

In the alternative, Defendant Lane argues that her actions in concurring with the committee's recommendation to house Plaintiff back in "F" dormitory after his release from room restriction is protected by the doctrine of qualified immunity. Qualified immunity shields government officials performing discretionary functions from civil trials for money damages and prevents them from being held liable in their individual capacities insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. D'Aguanno v. Gallagher, 50 F.3d 877, 879 (11th Cir. 1995) (citations and quotations omitted). Once the public official has proved that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Defendant was, at the time applicable to the Complaint, the Safety Director at the FCCC, which was operated by Liberty Behavioral

---

[8](...continued)
The standard acknowledges "that courts must show deference to the judgment exercised by a qualified professional," id. at 322, and that "i[f] or these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323 (footnotes omitted). A "qualified professional" is defined as s "a person competent, whether by education, training or experience, to make the particular decision at issue." Id. at 323 n. 30. Here, there is no evidence that the decision rendered by the Administrative Committee, including Defendant Lane, deviated from "accepted professional judgment."

Healthcare Corporation pursuant to a contract with the Department of Children and Family Services, and clearly was performing discretionary functions.

> The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, --- U.S.---, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). If a constitutional right would have been violated under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. 2151; see also Lee, 284 F.3d at 1194.

Vinyard v. Wilson, 311 F.3d 1340, 1346-47 (11th Cir. 2002).

Here, the Court has found the undisputed facts demonstrate that Defendant Lane did not violate the Plaintiff's constitutional rights. Thus, the Court need not address the second step in the qualified immunity analysis. Saucier, 533 U.S. at 201. Any other claims not specifically addressed are found to be without merit.

ACCORDINGLY, it is hereby

**ORDERED and ADJUDGED:**

1. Defendant Lane's Renewed Motion for Summary Judgment (Doc. #87) is **GRANTED.**

2. The **Clerk of Court** shall: 1) enter judgment accordingly, 2) terminate any pending motions; and 3) close this file.

**DONE AND ORDERED** in Fort Myers, Florida, on this   23rd   day of March, 2009.

_____
JOHN E. STEELE
United States District Judge

SA: hmk
Copies: All Parties of Record